579 So.2d 429 (1991)
AMERICAN MOTORIST INSURANCE COMPANY
v.
AMERICAN RENT-ALL, INC., Bruce Lee, and the Hanover Insurance Company.
Rose Ann WALTON
v.
AMERICAN RENT-ALL, INC., Bruce Lee, and the Hanover Insurance Company.
Nos. 90-C-2293, 90-C-2291.
Supreme Court of Louisiana.
May 6, 1991.
*431 Cerio A. DiMarco, Edward J. Lassus, New Orleans, for plaintiff-applicant American Motorist Ins. Co.
Charles W. Schmidt, Christovich & Kearney, New Orleans, for defendants-respondents American Rent-All, Bruce Lee, Hanover, Massachusetts Bay.
Leonard J. Cline, Metairie, Joseph H. McCusker, New Orleans, for defendant-respondent Rose Walton.
MARCUS, Justice.
On February 5, 1985, Rose Ann Walton was injured when the vehicle driven by her and owned by her employer, American Waste and Pollution Control Company (American Waste), was rear-ended by a pick-up truck owned by American Rent-All, Inc. and operated by its employee, Bruce Lee. She filed suit against American Rent-All, Bruce Lee, and The Hanover Insurance Company, the liability insurer of American Rent-All. American Motorists Insurance Company (American Motorists), the worker's compensation insurer of Mrs. Walton's employer, American Waste, brought a separate suit against the same defendants for recovery of compensation benefits and medical expenses paid and to be paid to Mrs. Walton. The two suits were consolidated for trial. Mrs. Walton amended her petition to add Jeffrey Walton as a party plaintiff and to include a claim by him for loss of consortium. Defendants stipulated Bruce Lee was an employee of American Rent-All, he was in the course and scope of his employment when the accident occurred, the vehicle he was driving was owned by American Rent-All and insured by The Hanover Insurance Company, and Mr. Lee was liable for the accident. After a bench trial, judgment was rendered in favor of Rose Ann Walton and against American Rent-All and Bruce Lee in solido for the total sum of $1,538,628.93 and against Massachusetts Bay Insurance Company (incorrectly identified in the pleadings as The Hanover Insurance Company) to the extent of its policy limits of $500,000. The damage awards were itemized as follows:

Past Medicals..................... $ 63,996.93
Future Medicals................... $ 10,500.00
Future Psychiatric Cost........... $ 148,000.00
Vocational Rehabilitation
Center Cost....................... $ 135,000.00
Past Lost Wages................... $ 62,439.00
Past and Future Physical
Pain and Suffering................ $ 300,000.00
Past and Future Mental Anguish
and Distress...................... $ 300,000.00
Future Lost Wages................. $ 518,693.00
 _____________
 TOTAL..................... $1,538,628.93

Judgment was further rendered in favor of Jeffrey Walton and against defendants for the sum of $55,000 for loss of consortium. Judgment was also rendered in favor of American Motorists and against defendants for recovery of compensation benefits and medical expenses as prayed for.
American Rent-All and Bruce Lee appealed. The court of appeal reversed the awards in favor of Rose Ann Walton for future psychiatric cost and for future vocational rehabilitation center cost, reduced the award for past and future physical pain and suffering and for past and future mental anguish and distress to $50,000 each, reduced the award for future lost wages to $324,298 and reduced the award in favor of Jeffrey Walton for loss of consortium to $10,000. The awards in favor of Rose Ann Walton for past medicals, future medicals *432 and past lost wages were affirmed.[1] The effect of the judgment of the court of appeal was to reduce the judgment in favor of Mrs. Walton from $1,538,628.93 to $561,233.93 and in favor of Jeffrey Walton from $55,000 to $10,000. Upon separate applications by Rose Ann Walton and American Motorists, we granted certiorari and consolidated the applications for hearing before this court.[2]
The issue presented for our review is whether the injuries sustained by Mrs. Walton were caused by the accident, and if so, the proper award for damages.
Rose Ann Walton was forty-one years old at the time of the accident in February of 1985. She was married to her second and present husband, Jeffrey Walton, in 1978, and a son was born in 1979. She began working for American Waste in 1972 doing accounting and secretarial work. In 1978 she was promoted to outside salesperson, and by 1985, she was making twelve to fifteen customer service calls a day. In 1985 she earned about $27,458 including $9,225 in commissions, and she was provided with fringe benefits including the use of a company car. She was on her way to make a sales call when the accident occurred. The impact of the rear-end collision threw her vehicle forward about fifty feet and jerked her body forward and backward causing a headache and neck and back pain. Later that same day, Mrs. Walton consulted her family physician, Dr. Russell Rawls. He diagnosed a cervical sprain with associated headaches and prescribed muscle relaxants and analgesics. From March to September of 1985, Mrs. Walton was treated by Dr. Mark Juneau, Jr., an orthopedist, who recommended treatment of her neck pain with physical therapy and medication. When this treatment failed to provide relief, Mrs. Walton consulted a neurosurgeon, Dr. Raymond Llewellyn, in October of 1985. Testing revealed a rupture at the C 5-6 and C 6-7 vertebral levels. Although Dr. Llewellyn recommended surgery, Mrs. Walton opted for continued conservative treatment because she did not want to undergo the trauma of surgery. She continued to work for American Waste under increasing physical discomfort. She became depressed, and testified that she could no longer perform her household duties and take care of her child. Her weight went from about 115 pounds at the time of the accident to 175 pounds a year later. She was taking pain killers, weight control medication and tranquilizers. In July of 1986, Mrs. Walton left her employment at American Waste. Finally, in March of 1987, Dr. Llewellyn performed a two-level diskectomy on Mrs. Walton resulting in a 15% anatomical disability.
Despite successful surgical results, Mrs. Walton continued to complain of neck pain. In January of 1988, she attempted to return to work at American Waste as a telephone salesperson but left after two weeks complaining that she could not perform her duties. She continued taking various medications and at the time of trial (June, 1988) she weighed about two hundred pounds.
Dr. Elodie Braud, a psychiatrist who treated plaintiff periodically from 1971 to 1984, was called as a witness by the defense. Dr. Braud testified that plaintiff was hospitalized in 1971 for six weeks when she suffered a depressive episode following the death of her father and two sisters. She was again hospitalized for six months in 1977 for treatment for depression following the breakup of a romantic relationship. According to Dr. Braud, she made a good recovery from both episodes. Dr. Braud diagnosed Mrs. Walton as having what is currently known as a borderline personality disorder, a condition which would manifest itself when there were stresses and losses in her life. Dr. Braud prescribed Stelazine, a tranquilizer, on a regular basis and saw Mrs. Walton periodically. She last saw Mrs. Walton in 1984 when Mrs. Walton came to her to talk about ordinary family problems. Dr. Braud testified that while Mrs. Walton could handle everyday stresses in her life, *433 she lacked the coping abilities to handle major stresses, and that an automobile accident which would cause serious injuries and result in the loss of her job could trigger a major depressive episode in her life.
In June of 1987, Mrs. Walton consulted Dr. Millard Jensen, a psychiatrist. He testified that her primary symptoms were loss of interest, excessive weight gain, a depressed mood and an inability to cope, as well as an ongoing set of physical symptoms such as pain in the neck, back and shoulders. He also diagnosed Mrs. Walton as suffering from borderline personality disorder. Dr. Jensen began seeing Mrs. Walton on a twice monthly basis, then a weekly basis, increasing to twice weekly in January through March, 1988. Because her response was poor and her depression intensified, she was hospitalized in April of 1988 for three weeks to treat her depression, to decrease her dependence on medication and to deal with her weight problem. Dr. Jensen testified that a serious accident resulting in disc surgery and the loss of her job would have a very traumatic effect on Mrs. Walton. He further testified that she was unemployable in her present condition. He also testified that Mrs. Walton continues to suffer from the same symptoms and recommended long-term psychiatric treatment.
Dr. Remy Culver, a psychiatric expert called by the defense, examined Mrs. Walton in May of 1988. He agreed with Drs. Braud and Jensen that she suffered from a borderline personality and a somatic pain disorder. He testified that given Mrs. Walton's psychiatric history, she was not well suited to deal with a significant intervening event in her life such as a personal injury or surgery and any other trauma that would confront her.
In addition to Mrs. Walton and Drs. Rawls, Juneau, Llewellyn and Jensen, other witnesses who testified at trial for plaintiffs were Mr. Charles Dees, Mrs. Walton's former supervisor at work, Mr. James Knap, a general manager at American Waste, Ms. Dorothy Hopkins, a friend and co-worker of Mrs. Walton's, Dr. Bobby Roberts and Dr. Robert Voogt, vocational rehabilitation experts, Dr. Melville Wolfson, an economist, and Mrs. Walton's husband, Jeffrey Walton. Defendants called as witnesses, besides Drs. Braud and Culver, Dr. Ranjan Shety, a physical therapist, and Dr. Jonathan Wood, an economist.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the accident and the injuries complained of. Aucoin v. State Farm Mut. Auto. Ins. Co., 505 So.2d 993 (La.App. 3d Cir.1987); Richard v. Walgreen's Louisiana Co., 476 So.2d 1150 (La. App. 3d Cir.1985). It is well settled in our jurisprudence that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Where defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of his aggravation. Perniciaro v. Brinch, 384 So.2d 392 (La.1980).
Our review of the record reveals that plaintiffs have met the burden of proving that Mrs. Walton's physical injuries were caused by the accident. Mrs. Walton was asymptomatic prior to the accident. She experienced neck and back pain following the accident. We further find that the record supports the conclusion that the trauma of the accident caused Mrs. Walton's underlying psychiatric condition to manifest itself and that her present depressed state was triggered by the injuries caused by the accident. Accordingly, Mrs. Walton is entitled to recover damages for her physical injuries and for the aggravation of her preexisting psychiatric condition.
In the assessment of damages in cases of offenses and quasi offenses, much discretion must be left to the judge or jury, and before an appellate court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. In the event the appellate court finds from the record an abuse of discretion, the award may be disturbed by lowering it to the highest point which is reasonably within *434 the discretion afforded the trier of fact. Carollo v. Wilson, 353 So.2d 249 (La.1977); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). We will now review the amount of damages.

PAST AND FUTURE PHYSICAL PAIN AND SUFFERING
From February, 1985, when the accident occurred, until March, 1987, when surgery was performed, Mrs. Walton suffered from neck, back, shoulder and arm pain and headaches. She tried physical therapy and conservative treatment for her injuries for two years with little or no improvement. She continued to work in pain despite her injuries until July of 1986. Her mother and husband had to take over more and more household and childrearing duties. She steadily gained weight and increased the types of medication she was taking.
Her surgery left her with a 15% anatomical impairment. Dr. Llewellyn explained that Mrs. Walton would be disabled or restricted in some actions such as repetitive bending, stooping, and lifting. Dr. Llewellyn testified that Mrs. Walton's surgical results were successful. However, after surgery, she continued to complain of neck pain, to gain weight and to take medications. Dr. Llewellyn testified that given her associated health problems, Mrs. Walton would require continued medication. He recommended physical therapy which should relieve some of the physical discomfort. He further testified that if Mrs. Walton's associated health problems improved, her overall physical condition should improve.
We find that the record clearly reveals that the trial judge abused his discretion in awarding $300,000 for past and future physical pain and suffering. We consider the maximum amount reasonably within the discretion of the trial judge to be $150,000. Accordingly, the court of appeal erred in reducing the award to $50,000.

PAST AND FUTURE MENTAL ANGUISH AND DISTRESS
Prior to the accident, Mrs. Walton held a responsible position as outside salesperson for American Waste for eight years. She testified that her job was very important to her. Dr. Jensen testified that Mrs. Walton's job was a stabilizing factor in her life. Mr. Charles Dees, her supervisor, testified that she was a good, stable and loyal employee and she displayed no psychiatric problems on the job. Dr. Braud testified that although Mrs. Walton had suffered prior depressive episodes requiring hospitalizations in the past, when she last saw Mrs. Walton in 1984, she was successfully married with a child and a family life and very thin and attractively dressed.
After the accident, Mrs. Walton's emotional condition gradually deteriorated. She became anxiety ridden, suffered from insomnia and excessive weight gain and gradually became unable to cope with her household activities or to keep up with her work responsibilities. She finally quit working about a year and a half after the accident. She has been treated by Dr. Jensen, a psychiatrist, since June of 1987 on a regular basis. She currently suffers from severe depression and is overweight and overmedicated. Dr. Jensen was of the opinion that Mrs. Walton was unemployable in her present condition. The opinions of Drs. Jensen, Culver and Braud, psychiatric experts, are not in dispute. All three testified that Mrs. Walton suffered from a psychiatric disorder known as a borderline personality which would manifest itself under traumatic events. Thus, given her past history, all agreed that an event such as the automobile accident that Mrs. Walton suffered could trigger a major depressive episode. As to her future prognosis, they agreed that she could benefit from intensive psychiatric treatment. While it is highly unlikely that Mrs. Walton can return to her former position with American Waste, given the right treatment, she would be able to return to sedentary employment in the future.
After a review of the record, we find that the trial judge abused his discretion in awarding $300,000 for past and future mental anguish and distress. We consider the maximum amount reasonably within *435 the discretion of the trial judge to be $150,000. Accordingly, we find that the court of appeal erred in reducing the award to $50,000.

FUTURE PSYCHIATRIC AND VOCATIONAL REHABILITATION CENTER COSTS
Dr. Jensen testified that Mrs. Walton would benefit from long term and intensive psychiatric treatment. Dr. Culver, defendant's psychiatric expert, agreed that she should continue to get psychotherapy. Dr. Jensen recommended a six-month program in a hospital facility that would include psychiatric and weight control treatment, drug detoxification, vocational rehabilitation and physical therapy in a structured environment. The cost would be about five thousand dollars a week for the institution and three thousand dollars a month for a psychiatrist for a total sum of $148,000. The trial judge awarded this amount. The court of appeal reversed the award.
Dr. Bobby Roberts, a vocational rehabilitation evaluation specialist, first interviewed Mrs. Walton on January 19, 1988. After a series of written and physical tests, Dr. Roberts was of the opinion that Mrs. Walton needed a comprehensive six-month multi-disciplinary rehabilitation program which would include treatment by physical therapists, vocational counselors, psychiatrists, occupational therapists, a general physician and treatment for substance detoxification. Dr. Robert Voogt, a rehabilitation specialist, recommended a similar plan of treatment. Both testified that a six-month comprehensive program at such a facility would cost from $750 to $1000 per day. The amount awarded by the trial judge of $135,000 would cover a six-month stay at the cost of $750 a day. Defendants offered the testimony of Ranjan Shety, a physical therapist, who examined Mrs. Walton in February of 1988. He recommended a maximum of six months of physical therapy after which Mrs. Walton could return to sedentary employment.
After reviewing the record, we think the trial judge erred in allowing awards for both future psychiatric treatment and for future rehabilitation. Each program was for six months. The psychiatric program described by Dr. Jensen would offer psychiatric treatment, drug detoxification, weight control, physical therapy and vocational rehabilitation in a structured environment. The program suggested by Dr. Roberts is so substantially similar to that described by Dr. Jensen that awards covering both programs would be duplicative. We think that the psychiatric treatment program recommended by Dr. Jensen will rehabilitate Mrs. Walton's major problems of depression, weight control and substance abuse and include therapy for her physical problems and vocational counseling as well. Hence, the trial judge erred in awarding sums to cover both psychiatric and vocational rehabilitation programs rather than solely for the psychiatric program. The court of appeal erred in disallowing sums to cover both programs. The trial judge correctly awarded $148,000 for future psychiatric treatment.

FUTURE LOST WAGES
The trial judge had the benefit of the testimony of two economists relative to the issue of future lost wages. Dr. Melville Wolfson, an economist, testified on behalf of plaintiffs. Based on Mrs. Walton's 1985 and 1986 income tax returns, her age of forty-four at the time of trial and a work-life-expectancy of 16.1 years, Dr. Wolfson determined her average yearly income to be $31,306. He then took that figure and applied a 5.6% inflation rate and a 7.5% discount factor to estimate Mrs. Walton's loss of future earning capacity including a loss of her fringe benefits estimated at $101,000 to be approximately $518,000. If her fringe benefits were not calculated in the loss, then her loss of future wages would be $417,693. Assuming that Mrs. Walton returned to minimum wage employment, Dr. Wolfson would deduct the sum of $93,395 from either lost wage sum based upon her ability to earn $7000 a year. Thus, Dr. Wolfson testified that if Mrs. Walton could return to minimum wage work with fringe benefits, then her future lost wages would total $324,298, *436 and without fringe benefits her future lost wages would be about $424,000.
Dr. Wood, who testified on behalf of defendants, determined Mrs. Walton's yearly income to be $24,417. Applying a higher discount rate of 8.5% and allowing for inflation, he estimated Mrs. Walton's future lost wages at between $164,284 and $191,101 and even lower if she returned to minimum wage employment. Dr. Wood testified that most jobs do offer some fringe benefits.
Both courts below accepted the findings of plaintiffs' expert (Dr. Wolfson). The trial judge awarded $518,693 in future lost wages determining that even with appropriate treatment, it was too speculative to resolve whether Mrs. Walton would be able to return to work. The court of appeal reduced the award reasoning that the medical testimony supported the conclusion that Mrs. Walton was employable in a sedentary capacity. It awarded $324,298 in lost wages based upon the amount that Dr. Wolfson determined Mrs. Walton could earn at minimum wage with fringe benefits. Our review of the record reveals that the trial judge abused his discretion in awarding $518,693 in future lost wages. The testimony of Drs. Jensen, Llewellyn and Roberts was that if Mrs. Walton participated in a six-month comprehensive program that included treatment of her psychiatric and physical conditions, and her weight and substance abuse problems, as well as a vocational rehabilitation component, then she should be able to return to the work force in a sedentary capacity at minimum wage. After previous hospitalizations for depressive episodes resulting from major stresses, Mrs. Walton had been successful in returning to work and coping with ordinary life situations. While fringe benefits vary depending on the type of industry, the occupation within the industry, and the size of the employer, it is likely that Mrs. Walton will receive some fringe benefits as part of her future employment. Hence, the court of appeal was correct in reducing the award to $324,298 which is the amount that plaintiffs' economist recommended that Mrs. Walton would earn at minimum wage with fringe benefits. Accordingly, we affirm the award of the court of appeal.

LOSS OF CONSORTIUM
Jeffrey Walton testified that since the accident he has taken over the household duties and looked after their child. Before the accident he and Mrs. Walton would enjoy a lot of recreational and social activities together, but after the accident Mrs. Walton would attempt to work and then need to rest in her spare time. Both of the Waltons testified that their marital life had suffered because of her injury and ensuing pain and depression. We agree with the courts below that Mr. Walton is entitled to an award for loss of consortium in that the accident had a significant effect on the Waltons' lifestyle. The trial judge awarded $55,000 and the court of appeal reduced the award to $10,000. We think the trial judge abused his discretion in awarding $55,000 to Jeffrey Walton for loss of consortium. We consider the maximum amount reasonably within the discretion of the trial judge to be $25,000. Accordingly, the court of appeal erred in reducing the award to $10,000.

PAST MEDICALS, FUTURE MEDICALS AND PAST LOST WAGES
Neither party has disputed the awards for past medicals, future medicals and past lost wages. The court of appeal affirmed the awards of the trial judge. Hence, we affirm the award of $63,996.93 for past medicals, $10,500 for future medicals and $62,439 for past lost wages.

 SUMMARY OF DAMAGE AWARDS
Past Medicals................... $ 63,996.93
Future Medicals................. $ 10,500.00
Future Psychiatric Cost......... $ 148,000.00
Vocational Rehabilitation
Center Cost..................... $ -0-
Past Lost Wages................. $ 62,439.00
Past and Future Physical
Pain and Suffering.............. $ 150,000.00
Past and Future Mental Anguish
and Distress.................... $ 150,000.00
Future Lost Wages............... $ 324,298.00
Loss of Consortium ............. $ 25,000.00
 ____________
 TOTAL................... $ 934,233.93

*437 DECREE
For the reasons assigned, the judgment of the court of appeal denying damages for future psychiatric cost is reversed. The judgment of the trial court of $148,000 for future psychiatric cost is reinstated. The judgment of the court of appeal is amended to increase the award for past and future physical pain and suffering from $50,000 to $150,000, to increase the award for past and future mental anguish and distress from $50,000 to $150,000, and to increase the award for loss of consortium from $10,000 to $25,000. Otherwise, the judgment of the court of appeal is affirmed. Costs of this appeal are assessed against defendants.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART AND RENDERED.
DENNIS, J., concurs in part and dissents in part for reasons.
WATSON, J., concurs in the result.
NOTES
[1] 566 So.2d 121 (La.App. 5th Cir.1990).
[2] 572 So.2d 53 (La.1991) and 572 So.2d 54 (La.1991).